.(92 South. 433)

### PAYNE, Director General, v. ZIMMERN.
### (I Div. 202.)

(Supreme Court of Alabama. Dec. 22, 1921. Rehearing Denied Jan. 19, 1922.)

**1. Shipping ⬤==108 — Quotation of rate for transportation by barges and shipper's acceptance held to make a binding contract.**

Where Director General of Railroads in letter to shipper of coal quoted certain rate for transportation of specified amount of coal by barges between two points, and the shipper by letter to railroad stated that rate so quoted was satisfactory, and that the railroad would be advised in due time when shipper would be ready for its barges, there was a complete contract ·requiring the railroad to furnish the barges, though shipper inquired in its letter as to the through rate from the mine to the· point of destination involving transportation by rail to point where coal was to be loaded on barges, such inquiry not constituting a counter offer as a rejection of the original offer, since the rate by rail was fixed by law, and the only proper subject of special contract being the transportation of the coal by the barges.

**2. Shipping ⬤==108—Performance of contract to furnish barges within a reasonable time implied in absence of stipulation fixing time.**

Where a contract to furnish barges for the transportation of coal did not fix the time within which the service was to be performed, the law contemplates performance within a reasonable time.

**3. Shipping ⬤==108 — Carrier contracting to transport coal from Mobile without spec:fying place of loading was required to take cargo at any reasonable place in the harbor.**

Where a contract to transport specified amount of coal by barges from Mobile to spec-ified point did not specify the place for loading, it was the carrier's duty to take the cargo at any reasonable accessible place in the harbor of Mobile that might be designated by the shipper:.

**4. Railroads ⬤==5½, New, vol. 6A Key-No. Series—Director General subject to act to regulate commerce.**

The Director General of Railroads was subject to the act to regulate commerce (U. S. Comp. St. § 8563 et seq.), and all the rules and regulations of the Interstate Commerce Commission, except in so far as inconsistent with the Federal Control Act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, 3115¾a–3115¾p).

**5. Shipping ⬤==3½, New, vol. 8A Key-No. Series—Federal manager appointed by Director General of Railroads held authorized to make contract for transportation of specified amount of coal by barges.**

Under Federal Control Act, § 6 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, § 3115¾f), and General Order of the Director General of Railroads, No. 35, appointing a federal manager of Mississippi and Warrior Waterways for the United States Railroad Administration to have charge of the construction and acquisition of equipment for use upon ·the Warrior river between the Alabama coal fields and Mobile and upon the Mississippi Sound and connecting waters between Mobile and New Orleans, the federal manager so appointed had authority to make contract for the transportation of coal from Mobile to Ft. Morgan by barges.

**6. Shipping ⬤==108—Measure of damages for Director General of Railroad's breach of contract to transport specified amount of coal by barges stated.**

Shipper suing Director General of Railroads for breach of contract to transport specified amount of coal by barges at agreed rate could recover the difference between the cost of transporting the coal at the agreed rate and the cost reasonably incurred in procuring a substitutionary performance.

**7. Shipping ⬤==108—In shipper's action for failure to transport specified amount of coal by barges, carrier could show contract for delivery of coal had been canceled as to coal not delivered.**

In shipper's action for breach of contract to transport specified amount of coal by barges, in which the shipper testified that he had procured a postponement of the delivery of a portion of the coal until certain time, but that no delivery had ever been made, the carrier was entitled to show that the shipper's contract had been canceled as to the coal not so delivered, and that no delivery could ever be made under the contract.

**8. Shipping ⬤==108—Shipper suing for breach of contract to transport coal by barges could not recover for coal not transported by other means without showing that by reasonable diligence such coal could not be delivered.**

In shipper's action for breach of contract to transport specified amount of coal by barges at specified rate, where only a portion of the

specified amount of coal had been delivered by other means, the shipper could not recover damages for breach of contract to transport the coal not so transported by other means, in the absence of a showing that the shipper had been unable, by the exercise of reasonable diligence, to deliver the balance of such coal not transported, since in the absence of such a showing such damages were speculative.

Appeal from Circuit Court, Mobile County; C. A. Grayson, Judge.

Action by Zimmern's Coal Company against John Barton Payne, as Agent for John Barton Payne, Director General of Railroads, for damages for failure to transport coal. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

The following are the letters referred to:

"Mobile, Alabama, July 21, 1919.

"Mr. Theodore Brent, Traffic Mgr., U. S. River Transportation, Hibernia Bank Bldg., New Orleans, La.—Dear Sir: We have some 3,000 tons of coal to be delivered to Ft. Morgan, most of which will come from the Empire mines loaded over the tips at Cardova. We wish to deliver this coal to the fortifications. Kindly quote us rate and also whether we can be furnished the unloading device that is now located at Mobile for the discharging of the barge.

"We are having from time to time inquiries for steamers to be coaled at Ft. Morgan and will you not kindly quote us a rate for carrying coal and the time allowed for discharge, etc.

"The wharf at Ft. Morgan has a depth of 12 to 14 feet and the only wind that will be of any detriment is the north wind.

"Yours very truly,
"Zimmern's Coal Company,
"S. Zimmern."

"New Orleans, La., July 23, 1919.
"File 55–6–B.

"Mr. S. Zimmern, Zimmern's Coal Company, Mobile, Alabama—Dear Sir: This will acknowledge receipt of your letter July 21st concerning movement of coal to Ft. Morgan.

"I have taken the matter up with Mr. De Bardeleben to see whether the shovel at Mobile can be released for this service, and will write you further as soon as we hear from him, or possibly he may address you direct.

"Yours truly,     Theodore Brent,
"Hough."

"Mobile, Ala., July 25, 1919.

"Mr. Theodore Brent, Traffic Mgr. Mississippi-Warrior River Section, New Orleans, La.—Dear Sir: Yours of the 23d inst., file 55–6–B, received and noted.

"We asked of you to quote us a rate on your steel barges for coal to Ft. Morgan, also whether steam shovel can go along. We know the Mobile Coal Company used your steam shovel the past year for the unloading of coal.

"Yours very truly,
"Zimmern's Coal Company,
"S. Zimmern."

"New Orleans, La., July 25, 1919.
"File 55–6–B.

"Mr. S. Zimmern, Zimmern's Coal Co., Mobile, Ala.—Dear Sir: With further reference to your letter July 21st concerning movement of coal to Ft. Morgan.

"Mr. De Bardeleben is here to-day and tells us the unloading device cannot stand the move from Mobile to Ft. Morgan. We might, however, be able to handle the coal on self-propelled barges, as they are seaworthy and can make the trip to Ft. Morgan all right.

"From railmines shown in our tariff No. 13 the rate to Mobile is $1.60 per ton, and we can quote you towage rate of 40 cents from Mobile to Ft. Morgan, minimum weight to be in accordance with provisions of tariff No. 13. Twenty-four hours free time would be allowed at Ft. Morgan for unloading, after which a demurrage charge of $10.00 per barge per hour or fraction thereof would be assessed for detention of the equipment due to causes beyond control of the master of the barge. It is understood, of course, unloading service at Ft. Morgan will be performed by and at owner's expense.

"Please let us know if you desire to take advantage of this handling in order that proper arrangements may be made with the operating department.

"Yours truly,     Theodore Brent,
"C/o Mr. De Bardeleben.     Hough."

"July 28, 1919.

"Mr. Theodore Brent, Traffic Manager, 905 Whitney-Central Building, New Orleans, La.—Dear Sir: We are in receipt of yours of the 25th inst., file 55–6–B, relative to movement of coal to Ft. Morgan, Ala.

"We desire to advise that the rate is satisfactory and we hope that you will advise Mr. De Bardeleben that the Mobile Coal Company has used the grab for delivery to Ft. Morgan last year, and such being the case, you no doubt would not permit one dealer to use the grab and the other one not. However, the use of the steel barge will be satisfactory at the rate and terms stipulated, and we hope you will get us the use of the grab, and if not we can arrange for same with others, but we prefer the government equipment.

"Yours very truly,
"Zimmern's Coal Company,
"S. Zimmern."

"New Orleans, July 29, 1919.

"Mr. S. Zimmern, Zimmern's Coal Co., Mobile, Ala.—Dear Sir: Your letter July 25th.

"The 40 cent per ton rate quoted in our previous communication covers movement of coal in self-propelled barges from Mobile to Ft. Morgan, being net to the Waterways; that is, it does not include loading on to barges at Mobile or unloading at Ft. Morgan. Our operating department advises that it is impossible to send the unloader down to Ft. Morgan, as this facility is not strong enough to stand the trip at this time.

"Yours truly,     Theodore Brent,
"Hough."

"Mobile, Ala., July 30, 1919.

"Mr. Theodore Brent, Traffic Manager, 905 Whitney-Central Building, New Orleans, La.—Dear Sir: Yours of the 29th inst. file 55–6–B, received and noted.

"Your rate of 40 cents per ton is satisfactory. The Empire mines advise they can load coal at Cardova or at the same point as the Sipsey

mines load their barges. What rate would you furnish us from the Empire mines to Ft. Morgan, or would you make any different rating?

"We have purchased a conveyor to unload coal without any delay, therefore, there will be no necessity for grabs or unloaders, as the device will be put aboard your barge, and should there be any extra cost of taking the conveyor, we will be pleased to pay you this extra charge.

"We shall advise you in due time when we will be ready for your barges.

"Thanking you for your prompt reply and assuring you of our appreciation, we are,

"Yours very truly,
"Zimmern's Coal Company,
"S. Zimmern."

"New Orleans, La., August 5, 1919. "Zimmern's Coal Co., Mobile, Ala.

"Subject: Coal from Empire Mines, Ala., to Ft. Morgan.

"Gentlemen: Referring to your favor of July 30th.

"We will give consideration to the matter brought up in your letter and will write you in a few days as to what arrangements we can make for the handling of coal from Mobile.

"Yours truly, Theodore Brent,
"RAB R. H. B."

"Mobile, Ala., Sept. 2, 1919.

"Mississippi-Warrior River Section (United States Railroad Administration) New Orleans, La.—Gentlemen: Attention Mr. Theodore Brent, Traffic Manager. We will require, within the next ten days, your steel barge to be loaded from the L. & N. coal tipples for Fort Morgan, according to your letter of July 25, file 55–6–B. Yours truly,

"Zimmern's Coal Company,
"Z/f S. Zimmern."

"N. O., La., September 4, 1919. "Zimmern's Coal Company, Mobile, Ala.:

"We are not in position to use self-propelled barges to carry coal from Louisville & Nashville tipple to Ft. Morgan.

"W. U. Frank 50786–C. Theodore Brent."

Stevens, McCorvey, McLeod & Goode, of Mobile, for appellant.

"In order that there may be an agreement, the parties must have a distinct intention common to both, and without doubt or difference. Until all understand alike, there can be no assent, and therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement." 13 Corpus Juris, 263, 264; McGowin Lmbr. & Export Co. v. Camp Lmbr. Co., 192 Ala. 35, 40, 68 South. 263; Houston v. Faul, 86 Ala. 232, 233, 5 South. 433.

Correspondence containing only preliminary negotiations directed to the settling of the terms of an agreement proposed to be entered into, does not constitute a contract. There must be the mutual intention to create and change legal relations. McGowin Lmbr. & Export Co. v. Camp Lmbr. Co., 192 Ala. 35, 40, 68 South. 263; 1 Elliott, Contracts, §§ 27, 61.

The alleged contract must have been obligatory upon both the plaintiff and the defendant, so that each might have had an action upon it, or neither will be bound. McGowin Lmbr. & Export Co. v. Camp Lmbr. Co., 192 Ala. 35, 39, 68 South. 263; 1 Elliott, Contracts, § 26.

A carrier's special contract to furnish equipment for transportation of goods is incomplete until the shipper and carrier have definitely agreed upon the time and place the equipment shall be furnished. Central of Ga. Ry. Co. v. Sigma Lmbr. Co., 170 Ala. 627, 54 South. 205, Ann. Cas. 1912D, 965; Baxley v. Tallassee & Montg. R. R. Co., 128 Ala. 183, 190, 29 South. 451; 10 Corpus Juris, 212, 213; 1 Page, Contracts, § 45; 1 Elliott, Contracts, § 30.

The defendant is a public officer and agent of the United States, operating the Warrior River Service under federal control, and is not subject to liability other than as a common carrier. Act of Congress of March 21, 1918, as amended March 2, 1919 (U. S. Comp. Stat., § 3115¾a, et seq.); Chicago & R. R. Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501; Vaughn v. State, 17 Ala. App. 35, 81 South. 417, 426; Moon v. Hines, 205 Ala. 355, 87 South. 603; 13 A. L. R. 1020; Hines v. Wimbish, 204 Ala. 350, 85 South. 765.

Harry T. Smith & Caffey, of Mobile, for appellee.

The correspondence formed a complete contract, and that which took place after the contract had been agreed upon is material only in showing the refusal to perform. 202 Ala. 183, 79 South. 667.

Where one of the stipulations of the contract is void, and is severable, the void stipulation falls, and the balance of the contract remains. 132 Ala. 212, 31 South. 488; 147 Ala. 589, 41 South. 806.

It is a duty of a vessel to take cargo at any proper place selected by the hirer. Scruton on Charter Parties, p. 97; 1 Q. B. 174.

There was no error in the charges as to damages. 128 Ala. 234, 29 South. 640; 110 Ala. 571, 20 South. 64; 36 Ala. 61.

SAYRE, J. Plaintiff, appellee, recovered judgment against defendant as for damages accruing by reason of defendant's breach of a contract whereby defendant, to quote the complaint, "undertook and promised to transport for the plaintiff 3,000 tons of coal from Mobile, Ala., to Ft. Morgan, Ala., in self-propelled barges, for the sum of 40 cents per ton." Defendant in the complaint and judgment is styled and called "John Barton Payne, as agent for John Barton Payne, Di-

rector General of Railroads," and, considering the acts of Congress setting up the Railroad Administration during the recent war (to be more specifically mentioned hereafter), we construe the action to be an action against John Barton Payne, as Director General, and not otherwise, and the judgment rendered to be in effect a judgment against the United States, nothing more nor less. Missouri Pacific R. R. Co. v. Ault, 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087. The parties appear to have concurred in this treatment of the cause.

[1, 2] It is insisted in the first place for defendant that there was no contract between the parties. The contract is to be found in the letters interchanged between the plaintiff and Theodore Brent, who, it is agreed, had full authority to act for the Director General in the premises. These letters, written in the summer of 1919, show in substance, we think, a meeting of the minds of the parties as to all the terms of the service for which the parties were negotiating and the compensation to be awarded therefor, as alleged in the complaint. The correspondence between the, parties will appear in the report of the case. From it we think there must be inferred an offer on the part of defendant to transport a definite quantity of coal between definite points for a definite compensation, and an acceptance on the part of plaintiff. This was more than a mere preliminary negotiation; it constituted a contract between the parties. 1 Williston on Contr. § 27. We have said that defendant's offer was to transport plaintiff's coal from Mobile to Ft. Morgan. Defendant's letter of July 25th said: "We can quote you towage rate of 40c from Mobile to Ft. Morgan," and this, after intervening correspondence, in which defendant explained that the rate offered did not cover "loading onto barges at Mobile or unloading at Ft. Morgan," and that it would be impossible to send defendant's "unloader" to Ft. Morgan—this was the offer accepted in plaintiff's communication of July 30th. No time was fixed within which the service stipulated was to be performed, but the contemplation of the law is that it was to be performed within a reasonable time.   Culver v. Caldwell, 137 Ala. 125, 34 South. 13; Byrne Mill Co. v. Robertson, 149 Ala. 273, 42 South. 1008. True, plaintiff in his letter of July 30th inquired: "What rate would you furnish us from the Empire mines to Ft. Morgan, or would you make any different rating?" But this was after plaintiff had said in the same letter, "Your rate of 40 cents per ton is satisfactory," and was followed by this language, "We shall advise you in due time when we will be ready for your barges."

There is abundant authority for the proposition that a conditional acceptance which amounts to a counter offer operates as a rejection of the original offer, the reason being that the counter offer is in effect a statement by the original offeree, not only that he will enter into the transaction on the terms stated in his counter offer, but also by implication that he will not assent to the terms of the original offer. Williston, § 51, where numerous cases are cited. The rate between the mines and Mobile was fixed by law; the rate between Mobile and Ft. Morgan was the proper subject of special contract between the parties, as we shall see, since in the carriage of freight between these last-named points defendant was not a common carrier. Plaintiff's letter of July 30th was as if he had said: I accept your offer according to its terms; but if you will make one through rate for both land and water transportation from the mines to Ft. Morgan more advantageous to me than the aggregate of the two separate rates, viz. the rate from the mines to Mobile plus the rate from Mobile to Ft. Morgan, then and in that event I should like to have. the advantage of such through rate. In view of conditions of railroad administration obtaining at the time—now a matter of history—plaintiff's inquiry was inept and nothing could have been reasonably expected of it. That, however, it is conceded, was of no particular consequence, since an inept inquiry may have disclosed the state of plaintiff's mind as to the matter at issue. The inquiry as to a different rating, quoted above, was certainly not a categorical rejection of the terms offered, nor, in our judgment, was it a counter offer—for it offered nothing different from what plaintiff had already offered—nor did it imply that, if defendant had no better terms to offer, plaintiff would not contract according to the terms of defendant's original offer, so to speak, of the total content of defendant's offer as of that date.

[3] Nor is it of any consequence in this regard that when plaintiff got ready to deliver his coal to defendant, though defendant had in the meantime given clear indication that he considered terms for transporting plaintiff's coal to rest yet in negotiation, plaintiff, on September 2d, notified defendant that he would require defendant's barge to be loaded within the next 10 days from the Louisville & Nashville tipple—conceded to be at Mobile. There is nothing to show that the Louisville & Nashville tipple was not a proper place for loading, nor is it contended that plaintiff delayed beyond a reasonable time. Other elements of contract being established, and no "loading spot" being contracted for, it was defendant's duty to take his cargo at any reasonably accessible place in the harbor of Mobile that might be designated by the shipper. Scrutton on Charterparties (8th Ed.) art. 39, p. 112 et seq. We conclude, therefore, that there was between the parties a contract of definite obligation in every necessary particular.

[4] In the next place we consider the argu-

ment that, in short, defendant, as Director General of Railroads, had no authority to make the contract in question. To state the elements of the contention briefly: Defendant in transporting freight from Mobile to Ft. Morgan was operating entirely under the act of Congress in virtue of which the government took possession of the "railroads and owned or controlled systems of coastwise and inland transportation engaged in general transportation," to the end that troops, war material, and equipment might be moved to the exclusion, so far as might be necessary, of all other traffic, and such systems of transportation utilized in the performance of such other service as the national interest may require, and, secondarily, in carrying on "the usual and ordinary business and duties of common carriers." President's Proclamation, December 26, 1917. Except in so far as it might be inconsistent with the Federal Control Act, the Director General was subject to the act to regulate commerce (U. S. Comp. Stat. § 8563 et seq.), and all the rules and regulations of the Interstate Commerce Commission. He was required to publish and file with the Commission his tariff of charges which necessarily included the tariff between all points between which he operated vessels as a common carrier. "All carriers subject to the statute who extend to any shipper or person any privilege or facility in the transportation of property under federal control, except such as are specified in the tariffs on file with the Interstate Commerce Commission, violate the provisions of section 6" of the Interstate Commerce Act. 1 Roberts, Federal Liabilities of Carriers, § 253. "An advantage accorded by special agreement which affects the value of the service to the shipper and its cost to the carrier should be published in the tariffs, and for a breach of such a contract, relief will be denied, because its allowance without such publication is a violation of the act." Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501. For the carriage of freight between Mobile and Ft. Morgan no tariff of rates was ever filed. Ergo, defendant's conclusion stated above.

[5] The court is of opinion that the conclusion cannot be maintained. By section 6, Federal Control Act, approved March 21, 1918 (U. S. Comp. Stat. 1918, U. S. Comp. St. Ann. Supp. 1919, § 3115¾f), it was provided that the President of the United States might construct barges and "in the operation and use of such facilities create and employ such agencies and enter into such contracts and agreements as he might deem in the public interest." By General Order No. 35 the Director General of Railroads appointed a Federal Manager of Mississippi and Warrior Waterways for the United States Railroad Administration to "have charge of the construction and acquisition of equipment for use * * * upon the Warrior river between the Alabama coal fields and Mobile, and in connection therewith for use upon the Mississippi Sound and connecting waters between Mobile and New Orleans, and will operate such equipment for the Director General of Railroads upon all such waters." The General Manager so appointed was empowered to enter into contracts "and for the transportation of traffic upon all such waters." 2 Roberts, p. 1772. In entering upon the contract in question, the defendant was not engaged in the business of a common carrier. He entered into a special contract for the delivery of coal to Ft. Morgan—to the government, if that makes any difference. There was no established tariff, and we must conclude that the barges used in this transportation were used in a case deemed by the President, or his authorized agent, for the public interest, in accordance with the laws of the United States and the orders of the Director General of Railroads made in pursuance thereof.

[6-8] It was shown that plaintiff at the date of the trial, December 8, 1920, had delivered to the fortifications at Ft. Morgan 2,111 tons of the coal he proposed to ship in September, 1919. There seems no reason to doubt that, if plaintiff was entitled to recover, he was entitled to have assessed to him the difference between the cost of transporting 2,111 tons at the agreed rate and the cost reasonably incurred by plaintiff. in procuring a substitutionary performance. But the trial court went further. It allowed plaintiff to recover damages for the amount, in excess of 40 cents a ton, that it would in the future cost the plaintiff to deliver the balance of the coal, say 889 tons. Plaintiff testified that he had procured a postponement of the delivery of this balance from the fall of 1919 until June, 1920, but that no delivery had ever been made. In this connection defendant was denied the right to show that plaintiff's contract had been canceled as to the balance of 889 tons and that no delivery would ever be made under the contract counted on. Exception was reserved to this ruling, and plaintiff's requested instruction to the effect stated above was given. On the case presented by the record these rulings were error. Plaintiff, appellee, cites a case, McFadden v. Henderson, 138 Ala. 234, 29 South. 640, in which was stated the more or less familiar rule for the assessment of damages as between vendor and vendee in case of a breach by failure to deliver. We may concede that, if plaintiff had been unable by the exercise of reasonable diligence to deliver this balance of coal to Ft. Morgan, in a proper state of the pleadings he might have recovered as special damages the profit he would have realized on a delivery according to contract. But plaintiff did not prove his inability to deliver the coal by means other than defendant's barges. The burden

was on plaintiff to show with reasonable certainty that the damages claimed in respect of this balance of 889 tons would result from defendant's breach of contract and their amount. Our judgment on the facts shown by the record is that the damages here in issue were speculative—not recoverable damages in any sense for the reason that plaintiff failed to offer any evidence to warrant the conclusion that they ever would or could occur. Sutherland on Damages (4th Ed.) § 121. And for the errors here indicated the judgment will be reversed; the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and MILLER, JJ., concur.